## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

PHARMACEUTICAL RESEARCH    :
AND MANUFACTURERS OF    :
AMERICA,    :               :
       :
         Plaintiff,    :
       :
         v.    :    Civil Action No:      2000-2990 (RMU)
       :
UNITED STATES *et al.*,    :    Document No.:      2
       :
         Defendants,    :
       :
     and    :
       :
THE STATE OF VERMONT,    :
       :
         Intervenor-Defendant.    :

**FILED**

**JAN 18 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## M E M O R A N D U M   O P I N I O N

### Denying the Plaintiff's Motion for a Preliminary Injunction;
### Dismissing the Complaint *Sua Sponte* as to Prescription Programs of States Not Named

## I.    INTRODUCTION

This matter comes before the court on a complaint and motion for preliminary injunction

filed by the Pharmaceutical Research and Manufacturers of America ("PHARMA").[1]  PHARMA

seeks to enjoin the State of Vermont ("Vermont") from implementing its Pharmacy Discount

Program ("PDP" or "the program"), a prescription-drug subsidy plan that the State put into effect

---

[1]    PHARMA is a trade association that represents American
pharmaceutical and biotechnology companies.  *See* Plaintiff's
Memorandum in Support of Motion for Preliminary Injunction
("Mot. for PI") at 2, 6.

1



on January 1, 2001 under the auspices of its Medicaid program.[2]  The program is an expansion of an existing "pilot project" that Vermont has operated, with the permission of the federal government, since 1996.

PHARMA contends the program violates Title XIX of the Social Security Act ("SSA"), 42 U.S.C. § 1396 *et seq.* ("the Medicaid statute") because it costs the state nothing but requires drug companies to cover 18 percent of the cost of covered prescription drugs.  PHARMA contends this feature violates the statutory requirement that a Medicaid plan include some "payment under a state plan" of the cost of "medical assistance."  PHARMA also contends the program violates the requirement in 42 U.S.C. § 1396o that states charge Medicaid beneficiaries no more than a "nominal" copayment.  Consequently, PHARMA urges the court to rule that the federal government violated the Administrative Procedure Act in approving the program.

The defendants named in the complaint, the Secretary of the U.S. Department of Health and Human Services and the Administrator of the Health Care Financing Administration (collectively, "HHS") have filed an opposition to the plaintiff's motion.  The intervenor-defendant, Vermont,[3] has filed its own opposition to the plaintiff's motion.[4]

For the reasons set forth below, the court will deny the plaintiff's motion for a

---

[2]     PHARMA also seeks a declaration that the Health Care Financing Administration ("HCFA") waiver issued to permit the PDP violated the Medicaid statute and thus was unlawful under the APA, and that PHARMA's members are therefore not obligated to pay any rebates under the PDP.  Alternatively, PHARMA seeks a declaration that HCFA's statutory waiver authority is unconstitutional because it is not guided by any standards; a permanent injunction against the PDP and similar programs in other states; a permanent injunction enjoining HHS from penalizing manufacturers for refusing to pay rebates under the PDP; and an award of attorneys' fees and costs. *See* Compl. at 27-29.  At this time the court does not determine whether PHARMA is entitled to these forms of permanent relief.

[3]     By Order dated January 2, 2001, the court granted Vermont's unopposed motion to intervene as a defendant.

[4]     In addition, HHS and Vermont have filed motions to dismiss the complaint.  The court does not resolve those motions now.

preliminary injunction.

## II.    BACKGROUND

### A.    The Medicaid Program

The federal government enacted the Medicaid program in 1965 as a cooperative undertaking between the federal and state governments to help the states provide medical care to lower-income individuals.  The primary objective of the Medicaid program is "to furnish (1) medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose incomes are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care."  42 U.S.C. § 1396.

Each state administers its own Medicaid program, but the states' programs are governed by federal statutes, regulations and guidelines.  Medicaid is funded jointly by the federal and state governments.  Each state prepares a Medicaid State Plan that describes the medical assistance the state has elected to make available and specifies who will be the beneficiaries among those eligible under federal law.  *See* 42 U.S.C. § 1396a (requirements for state Medicaid plans). Under Medicaid, the state pays providers and suppliers of medical goods and services according to established rates to cover the cost of services provided to individuals who are covered by the state plan.  The federal government then pays the state a statutorily established federal share of "the total amount expended . . . as medical assistance under the State plan . . . ."  SSA § 1903(a)(1), 42 U.S.C. § 1396b(a)(1).  This federal-to-state payment is known as federal financial participation ("FFP").  The Medicaid statute prohibits state governments from charging the beneficiaries more than a "nominal" copayment for prescription drugs and other benefits. PHARMA claims that current Medicaid prescription-drug sales nationwide amount to approximately $20 billion annually.  *See* Compl. ¶ 29.

### B.    Medicaid Prescription-Drug Rebate Agreements

Currently, the federal Medicaid statute includes a prescription-drug rebate program.  The rebate program requires each pharmaceutical company to reimburse the federal and state

3

governments for a portion of the governments' expenditures in providing that company's drugs to Medicaid beneficiaries. *See* 42 U.S.C. § 1396r-8. The federal government will not pay the state anything towards the cost of a manufacturer's drugs unless that manufacturer enters an agreement with HHS to pay a rebate to every state on all of its outpatient drugs that are covered by Medicaid ("rebate agreements"). *See* 42 U.S.C. § 1396r-8(a)(1).

Under these rebate agreements, each company pays a statutorily-specified rebate amount directly to each state on a quarterly basis. The amount paid to each state is based on the number of units of a manufacturer's drugs that are dispensed to Medicaid beneficiaries and paid for by the state under the state's Medicaid plan. *See* 42 U.S.C. § 1396r-8(b) and (c); 56 Fed. Reg. 7049 at Sections II(a) and II(b) (1991). PHARMA states that its members participate in the Medicaid drug-rebate program and have entered into the requisite rebate agreements with HHS, and the defendants do not contest this statement. *See* Compl. ¶ 31.

By statute, manufacturers need pay rebates only on drugs "for which payment was made under the State [Medicaid] plan." *See* Compl. ¶¶ 46 and 63 (citing SSA § 1927(b)(1)(A), 42 U.S.C. § 1396r-8(b)(1)(A)). As will be discussed in more detail below, this qualifier becomes a central point of contention between the parties. In brief, PHARMA contends that because the 18 percent discount on drugs dispensed under the PDP is later defrayed by the manufacturers' rebates to Vermont, it cannot be said that those drugs are drugs "for which payment [is] made under the State plan." *See* Compl. ¶¶ 47-48. Therefore, PHARMA contends, Vermont cannot require the manufacturers to pay rebates on drugs dispensed under the PDP unless HHS waives the statutory requirement of payment under the State plan. *See id.* ¶¶ 49 and 64. PHARMA further contends that HHS never waived that requirement and has no authority to grant such a waiver in any event. *See id.* ¶¶ 50-52 and 65; *see also id.* ¶¶ 53-56 and 70-76 (Medicaid's purpose is to provide "medical assistance," defined by 42 U.S.C. § 1396d(a) as "payment of part or all of the cost of" medical services, so the PDP does not meet the statutory definition of medical assistance).

## C.   Waivers and Medicaid "Pilot" Programs

Section 1115 of the Social Security Act permits HCFA to waive certain statutory

requirements for experimental "pilot" projects that HHS determines are likely to help promote the objectives of Medicaid. *See* 42 U.S.C. § 1315. This waiver authority offers a means by which states are permitted to test whether certain permitted variations from the state Medicaid plan requirements would provide a more efficient or effective means of accomplishing the objectives of the Medicaid statute. Specifically, section 1315(a) provides, in pertinent part,

> *In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of [the Medicaid statute and other statutes] . . . , in a State or States –*
>
> (2)(A) *costs of such project* which would not otherwise be included as expenditures under section 306, 655, 1203, 1353, 1383, or 1396b of this title, as the case may be . . . *shall, to the extent and for the period prescribed by the Secretary, be regarded as expenditures under the State plan . . . .*

42 U.S.C. § 1315(a)(2)(A) (emphasis added).

Moreover, HCFA regulations require a state to show that any pilot project will be "budget neutral," *i.e.*, that the federal government's costs over the life of the project will not exceed the contribution the federal government would make to the state under the state Medicaid plan in the absence of the waiver. *See* 59 Fed. Reg. 49249, 49250 (1994).

### D.    Vermont's Pilot Project: the Vermont Health Access Plan ("VHAP")

On July 28, 1995, HCFA approved a waiver of Vermont's Medicaid state plan requirements to permit Vermont to institute a pilot project known as the Vermont Health Access Plan. The waiver included approval to extend pharmacy supplemental benefits to elderly or disabled beneficiaries who have incomes up to 150 percent of the federal poverty level ("FPL"), as well as uninsured adults with incomes up to 150 percent FPL who are provided a comprehensive insurance program with a prescription-drug benefit. In addition, beginning in April 1999, the Vermont Health Access Plan provided "maintenance" medicines for elderly or disabled beneficiaries with incomes between 150 percent and 175 percent of the FPL. The

Health Access Plan imposed a 50 percent copayment on beneficiaries for prescription-drug purchases. *See* Intervenor-Defendant State of Vermont's Memorandum in Support of its Motion to Dismiss the Complaint ("Vermont's Mot. to Dis.") at 1-2. On June 5, 2000, HCFA extended Vermont's Health Access Program through the end of 2003. *See id.* at 2.

### E.   The Challenged Expansion of the Pilot Project: the Pharmacy Discount Program ("PDP")

#### 1.   Vermont Seeks Approval of the PDP

On March 17, 2000, Vermont wrote to HCFA seeking approval for a proposed expansion of the State's prescription-drug pilot project ("the waiver request letter"). *See* Compl. ¶ 36. The expansion extends Medicaid pharmacy benefits to approximately 70,000 Vermont residents who otherwise would not be eligible for such benefits. *See id.*; Bantham Dec., Ex. B. Specifically, the PDP would extend prescription-drug benefits to two additional groups of Medicaid beneficiaries: "(1) Medicare-covered individuals with incomes above 150 percent of the Federal Poverty Level (FPL) without drug coverage, and (2) all adults with incomes at or below 300 percent FPL who do not have a benefit program that includes drug coverage." *See* Waiver Letter at HCFA Special Terms and Conditions 13-14.

Under the PDP, Vermont pharmacies will charge the new Medicaid beneficiaries discounted[5] prices for prescription drugs. The PDP price for a prescription drug will equal the difference of (1) the Medicaid price for a prescription, *i.e.*, the price the state has agreed to pay pharmacies for prescriptions filled under Medicaid, minus (2) a fixed-percentage rebate initially set at 17.5 percent of that price.[6] Vermont implemented the PDP effective Monday, January 1,

---

[5]   In this context, the court takes "discounted" to mean a price lower than the market price the beneficiary would pay if he purchased the drug individually, outside the PDP. The parties do not provide a definition of the discount.

[6]   In the future, Vermont will set the rebate annually based on its estimate of the Medicaid rebates it expects to receive from manufacturers for drugs disbursed under the PDP. *See* Compl. ¶ 39.

2001. *See* Compl. ¶ 44; Waiver Request Letter, Mot. for PI, Ex. A ("Beneficiaries would have the ability to purchase drugs at a price that is equivalent to the price that Medicaid pays net of the manufacturers' rebate available to the Medicaid program.").

A Medicaid beneficiary enrolled in the PDP is required to make a copayment equal to 82.5 percent of a drug's Medicaid price. *See* Compl. ¶ 40. The State of Vermont will pay the pharmacy the remaining 17.5 percent of the drug's price. Then, "Vermont will bill manufacturers to collect the combined rebate amount quarterly, and will pass through the PDP discount to the pharmacies that sold the drugs to the beneficiaries." Compl. ¶ 41. As Vermont's waiver request explains, "Rebates collected from manufacturers will be deposited into a revolving fund and used to pay the subsidy. Initially, State funds, which have been included in the House Appropriations bill, will be provided to meet the cash flow needs of the program." Waiver Request Letter, Mot. for PI, Ex. A. In common parlance, the parties agree that Vermont will "front" the 17.5 percent. Vermont will be out of pocket for the 17.5 percent until it receives the corresponding manufacturer rebate. *See* Mot. for PI at 15 n.4. Nonetheless, because Vermont will eventually recoup its advance when it receives the rebate, PHARMA contends that "[n]o state funds will be expended."[7] *See* Compl. ¶ 41 (citing Waiver Request Letter at 2).

### 2.    HHS Approves the PDP

The Secretary of HHS approved the Vermont PDP by letter dated November 3, 2000 ("the waiver approval letter"). *See* Compl. ¶ 36. In reaching this decision, the Secretary determined that the PDP was "likely to assist in promoting the objectives" of the Medicaid Act. *See* Reply of HHS and HCFA in Support of Motion to Dismiss, or in the Alternative for Summary Judgment ("HHS Reply") at 2 (citing 42 U.S.C. § 1315(a)). The Secretary also determined that, for the life of the project, Vermont's PDP costs -- which apparently were not otherwise eligible for federal matching funds -- would be "regarded" as expenditures made "under the state [Medicaid] plan." *See* HHS Reply at 2; 42 U.S.C. § 1396(b) (defining state

---

[7]     Beneficiaries themselves will defray Vermont's costs of administering the PDP by paying a fee at the time of enrollment and each year thereafter. *See* Compl. ¶ 43 (citing Waiver Request Letter at 2, 3).

expenditures which are eligible for federal matching funds); 42 U.S.C. § 1315(a)(2)(A) (Secretary's waiver authority).

## III.   LEGAL STANDARD

### A.   Preliminary Injunctive Relief

This court may issue a preliminary injunction only when the movant demonstrates that:

> (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will not substantially injure the other party; and (4) the public interest will be furthered by an injunction.

*Davenport v. International Brotherhood of Teamsters*, 166 F.3d 356, 361 (D.C. Cir. 1999); *see also World Duty Free Americas, Inc. v. Summers*, 94 F. Supp.2d 61, 64 (D.D.C. 2000).  These four factors are not considered in isolation from one another, and no one factor is necessarily dispositive as to whether preliminary injunctive relief is warranted.  *See CityFed Financial Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995).  Rather, the factors "interrelate on a sliding scale and must be balanced against each other."[8]  *Davenport*, 166 F.3d at 361 (citing

---

[8]   When a party seeks an injunction to reverse policies that are already in place, "the moving party must meet a higher standard than in the ordinary case by showing 'clearly' that he or she is entitled to relief or that 'extreme or very serious damage' will result from the denial of the injunction."  *See Columbia Children's Hosp. for Women Foundation v. Bank of Tokyo-Mitsubishi, Ltd.*, 15 F. Supp.2d 1, 4 (D.D.C. 1997) (citation omitted), *judgment aff'd*, 159 F.3d 636 (D.C. Cir. 1998) (table, text in Westlaw); *see also Alaska Excursion Cruises, Inc. v. United States*, 595 F. Supp. 14, 18 (D.D.C. 1984) (attempt to alter *status quo*, rather than preserve it, must be supported by showing that "the facts and law clearly support" such a change).  PHARMA is not subject to this more stringent standard, however, because it filed its motion for a preliminary injunction before the challenged program was scheduled to take effect.  In any event, given the court's holding that PHARMA has not satisfied the customary standard for preliminary injunctive relief, then *a fortiori*, PHARMA would not satisfy the more stringent standard.

*Serono Labs. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998), *on remand*, 35 F. Supp.2d 1 (D.D.C. 1999)); *see also WMATA v. Holiday Tours, Inc.*, 559 F.2d 841, 842-43 (D.C. Cir. 1977) (court "examines each requirement in light of the others to determine whether an injunction would be proper").

In other words, a particularly strong showing on one factor may compensate for a weak showing on one or more of the other factors. *See Serono Labs. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). For instance, as to the first factor, "The court is not required to find that ultimate success by the movant is a mathematical probability, and indeed, [the court] may grant [an injunction] even though its own approach may be contrary to [the movants'] view of the merits. The necessary 'level' or 'degree' of possibility of success will vary according to the court's assessment of the other factors." *New Mexico v. Richardson*, 39 F. Supp.2d 48, 50 (D.D.C. 1999) (quoting *Holiday Tours*, 559 F.2d at 843). A strong showing of likely success on the merits may warrant issuance of preliminary injunctive relief even if the plaintiff makes a less compelling showing on the other three factors. *See Virginia Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("injury held insufficient to justify a stay in one case may well be sufficient to justify it in another, where the applicant has demonstrated a higher probability of success on the merits."); *National Wildlife Fed'n*, 440 F. Supp. at 1256 (enjoining further construction on dam power plant, despite dispute over irreparable injury, because "the court is convinced by plaintiffs' argument on the merits and therefore finds it sufficient on the question of irreparable injury . . .").

If the plaintiff makes a particularly weak showing on one factor, however, the other factors may not be enough to "compensate." *See Taylor v. RTC*, 56 F.3d 1497, 1506 (D.C. Cir.), *amended o.g. on reh'g*, 66 F.3d 1226 (D.C. Cir. 1995). It is particularly important for the plaintiff to demonstrate a substantial likelihood of success on the merits. *Cf. Benten v. Kessler*, 505 U.S. 1084, 1085 (1992) (*per curiam*); *University of Texas v. Camenisch*, 451 U.S. 390, 394 (1981); *Doran*, 422 U.S. at 934. If the plaintiff fails to make this showing, "it would take a very strong showing with respect to the other preliminary injunction factors to turn the tide in plaintiff['s] favor." *Davenport*, 166 F.3d at 367 (citing *Murrow Furniture Galleries v. Thomasville Furniture Indus.*, 889 F.2d 524, 527 (4th Cir. 1989)); *see, e.g., National*

*Pharmaceutical Alliance v. Henney*, 47 F. Supp.2d 37, 41 (D.D.C. 1999) ("Here, because the likelihood of success is slim, plaintiffs would have to make a very substantial showing of severe irreparable injury in order to prevail on their motion."). Indeed, absent a "substantial indication" of likely success on the merits, "there would be no justification for the court's intrusion into the ordinary processes of administration and judicial review." *American Bankers Ass'n v. National Credit Union Admin.*, 38 F. Supp.2d 114, 141 (D.D.C. 1999) (quoting *Holiday Tours*, 559 F.2d at 843).

Lastly, any injunction that the court issues must be carefully circumscribed and tailored to remedy the harm shown. *See National Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977 (D.C. Cir. 1990) (citation omitted).

### B.    Standing

The judicial power of the United States courts is limited to the resolution of "cases" or "controversies." *See* U.S. Const. Art. III, § 2, cl. 1. No justiciable case or controversy exists unless the plaintiff has standing to sue. The prerequisites for standing reflect the "common understanding of what it takes to make a justiciable case." *Steel Co. v. Citizens for a Better Environment*, 118 S.Ct. 1003, 1016 (1998). Namely, to establish standing under Article III,

> at an irreducible minimum . . . the party who invokes the court's authority [must] "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant", and that the injury "fairly can be traced to the challenged action" and "is fairly likely to be redressed by a favorable decision."

*Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 472 (1982) (footnotes and citations omitted); *MD Pharmaceuticals, Inc. v. DEA*, 133 F.3d 8, 11 (D.C. Cir. 1998). First, the plaintiff must show that it or its members have or will suffer some "'injury in fact' -- an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Allegations of speculative future injury do not suffice. *See Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); *Tenacre Foundation v. INS*, 892 F. Supp. 289, 294 (D.D.C. 1995), *aff'd*, 78 F.3d 693 (D.C. Cir. 1996). A future injury satisfies the

"imminence" requirement only if the injury is "certainly impending." *Lujan*, 504 U.S. at 565 n.2.

Second, to show that the alleged injury is "fairly traceable" to the challenged action, the plaintiff must make a "reasonable showing that 'but for' defendants' action the alleged injury" will not occur. *See Warth v. Seldin*, 422 U.S. 490, 504 (1975); *Community Nutrition Inst. v. Block*, 698 F.2d 1239, 1247 (D.C. Cir. 1983), *rev'd o.g.*, 467 U.S. 340 (1984); *see, e.g., Ellsworth Assocs. v. United States*, 926 F. Supp. 207 (D.D.C. 1996) (contractor lacked standing to challenge constitutionality of SBA set-aside program for "socially and economically disadvantaged" small businesses, because its inability to compete for a contract stemmed from fact that its eligibility had expired, not from set-asides). The plaintiff will be found to lack standing if the court must accept speculative inferences and assumptions in order to connect the alleged injury with the challenged action. *See National Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228 (D.C. Cir. 1987). Lastly, to prove that the alleged injury is likely to be redressed by a favorable decision, the plaintiff must show that a favorable decision would likely afford its members relief from the injury.

### C.    The Administrative Procedure Act

PHARMA asks the court to enjoin the Vermont PDP pursuant to its authority under the Administrative Procedure Act ("APA"). The APA provides, in pertinent part, that a court "shall . . . hold unlawful and set aside action, findings and conclusions found to be . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). The APA also directs the court to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see, e.g., Beno v. Shalala*, 30 F.3d 1057 (9th Cir. 1994). Nonetheless,

> once a project has been approved by the Secretary [of HHS], it is the function of the courts only to determine whether his decision was arbitrary and capricious and lacking in rational basis . . . . Given the large degree of judgment vested in the Secretary with respect to the approval of section 1115 projects ["pilot" or demonstration projects], it is not for the court to deny the Secretary the right to approve a project merely because the court might in certain situations disagree with his judgment. That judgment is committed to the Secretary and must be sustained as long as he exercises it within the confines of the statute.

*Crane v. Matthews*, 417 F. Supp. 532 (N.D. Ga. 1976); *cf. Georgia Hosp. Ass'n v. Department of*

*Medical Assistance*, 528 F. Supp. 1348, 1355 (N.D. Ga. 1982) (SSA section 1155, the Medicaid statute's waiver provision, "does not require the court to find whether th[e] project in fact will promote the objectives of the program, but rather, whether the Secretary . . . had a rational basis for his determination." It bears noting, however, that the gravamen of the instant complaint is that the Secretary abused her discretion by approving a program that does not comply with the Medicaid statute.

## IV.   DISCUSSION

PHARMA challenges the Vermont PDP on four grounds, three of which are intertwined. First, PHARMA contends that the PDP violates federal law by imposing more-than-nominal copayments on beneficiaries who purchase prescriptions drugs under the program. *See* Mot. for PI at 4-5 (citing 42 U.S.C. § 1396o(b)). In addition, PHARMA objects to the fact that the PDP's 17.5 percent discount to beneficiaries is funded entirely by manufacturer rebates, without any funding from the state or federal governments. This feature, PHARMA says, violates federal statutory provisions that HHS has not purported to waive and cannot waive. *See* Mot. for PI at 4, 5. PHARMA warns that absent a preliminary injunction, its members will be forced to choose between paying rebates under an unlawful program or refusing to pay the rebates at the risk of termination from the enormous national Medicaid prescription-drug market. *See id.* at 5-6.

For the reasons that follow, the court concludes that PHARMA is not likely to succeed on the merits. As to the copayment challenge, PHARMA may well lack standing. As to the contention that the PDP does not provide "medical assistance" because there is no "payment made under the state plan," PHARMA has standing but is not likely to prevail on the merits.

### A.   There is a Strong Argument that PHARMA Lacks Standing to Challenge the PDP's Beneficiary Copayments

The Medicaid statute imposes limits on copayments or other cost-sharing charges that states may impose on "individuals . . . who are eligible under the [state Medicaid] plan." *See* 42 U.S.C. § 1396o(b)(3). Such "deduction, cost sharing or similar charges imposed under the plan" must be "nominal in amount." *Id.* HHS has promulgated regulations defining what constitutes

the "nominal" copayments that may be required of individuals purchasing prescription drugs. For instance, where the state payment for a drug is ten dollars or less, the copayment may not exceed fifty cents; where the state payment is more than $50, the copayment may not exceed three dollars. *See* 42 C.F.R. § 447.54(a)(3); 42 U.S.C. § 1396r-8(b)(1)(A).

In PHARMA's view, the Vermont PDP violates these statutory and regulatory limitations because it requires beneficiaries to pay 82.5 percent of a drug's Medicaid price, far beyond any reasonable conception of a "nominal" copayment. *See* Compl. ¶¶ 59-60 and 82; Mot. for PI at 20-22 (discussing regulatory and dictionary definitions of "nominal"). PHARMA points out that HHS did not waive the copayment limitations and does not have authority to grant such a waiver in any event. *See* Compl. ¶¶ 60 and 83-84; Mot. for PI at 22 n.10. Consequently, PHARMA believes that the Secretary of HHS abused her discretion, in violation of the APA, by approving a program that included unlawfully high copayments. *See* Mot. for PI at 22 (quoting *Union of Concerned Scientists v. NRC*, 711 F.2d 370, 381 (D.C. Cir. 1983) ("When an agency's interpretation of its own rules flies in the face of the language of the rules themselves, it is owed no deference.")).

The court concludes, however, that there is a strong argument that PHARMA lacks standing to lodge its copayment objection.[9] The court's conclusion that PHARMA has standing to challenge other aspects of the PDP on behalf of its members does not give it standing to contest the copayments on behalf of Vermont's PDP beneficiaries. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services, Inc.*, 528 U.S. 167, 185 (2000) (standing must be demonstrated separately for each form of relief sought). PHARMA simply does not allege that it represents those beneficiaries or has any relationship or agreement with them that authorizes it to advance their putative interests in this matter. Thus, PHARMA is not likely to prevail on the merits of its challenge to the PDP's copayment structure.

The court next considers the likelihood that PHARMA will prevail on the merits of its

---

[9]     At this time the court does not determine conclusively whether PHARMA has standing to challenge the PDP copayment structure. The court will make that determination when it rules on the defendants' motions to dismiss.

other challenges to the Vermont PDP.

**B.   PHARMA's Contention that the Vermont PDP is Unlawful Because it Lacks the Requisite "Payment under the State Plan" and State-Funded "Medical Assistance"**

  1. <u>PHARMA Has Standing to Contest the PDP on Behalf of Its Members</u>

PHARMA is a trade association that represents American biotechnology and pharmaceutical companies.  PHARMA represented its members' interests during HCFA's consideration and approval of Vermont's prescription-drug pilot project under 42 U.S.C. § 1315. *See* Declaration of Russell A. Bantham dated December 12, 2000 ("Bantham Dec.") ¶¶ 4-6. Most of PHARMA's members have entered into Medicaid prescription-drug rebate agreements with HHS, including, *e.g.*, American Home Products and its Wyeth-Ayerst Laboratories Division, Schering-Plough Corporation, Eli Lilly and Company, Boehringer Ingelheim Pharmaceuticals Inc. and Pfizer Inc.  *See* Bantham Dec. ¶ 9; Alvernini Dec. ¶ 3; Bucko Dec. ¶ 3; Ciarelli Dec. ¶ 3; Hanna Dec. ¶ 3; McEnroe Dec. ¶ 3.  On a quarterly basis, each of these companies pays rebates directly to each state based on the number of units of its drugs that have been dispensed under the state's Medicaid program.  *See* 56 Fed. Reg. 7049 at Section II(a) and (b).  If these companies violate the rebate agreements by refusing to pay rebates mandated under a state's Medicaid program, HHS has the authority to terminate their participation in Medicaid drug programs nationwide.  *See* Fed. Reg. 7049 at Section VIII(c); *see also* Waiver Approval Letter, Special Terms and Conditions at 14 (HCFA permits Vermont to suspend or modify payments under the PDP if manufacturers' rebates are not timely paid to the state).

  The court agrees that PHARMA has standing to assert the legal rights of its members in this controversy.  *See* Mot. for PI at 13 n.3.  "It has long been settled that even in the absence of injury to itself, an association may have standing solely as the representative of its members." *UAW v. Brock*, 477 U.S. 274, 280 (1986) (citations omitted); *see, e.g., United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688-89 (1973) (finding standing for environmental group based on adverse effect of International Commerce Commission decision on its members).  PHARMA has "alleged facts that demonstrate that the actions of the

[government] threaten to harm the cognizable interests of" its member companies. *See National Wildlife Federation v. Burford*, 835 F.2d 305, 314 (D.C. Cir. 1987), *reh'g den.*, 844 F.2d 889 (D.C. Cir. 1988). Specifically, the parties agree that tens of thousands of previously ineligible Vermont residents are likely to enroll in the PDP. *See* Mot. for PI at 24; Waiver Request Letter, Mot. for PI, Ex. A at 2-3 (Commissioner of Vermont's Department of Social Welfare states, "Vermont anticipates that 37,550 Medicare covered beneficiaries and an additional 31,350 individuals under 300 percent of the FPL [federal poverty level] will be eligible for this expansion.").

The record supports PHARMA's expectation that these new beneficiaries' purchases of prescription drugs under the PDP "will quickly result in claims by Vermont for millions of dollars in rebates under the manufacturers' rebate agreements." *See* Mot. for PI at 24 (citing Bantham Dec. ¶¶ 11 and 14; Alvernini Dec. ¶¶ 4-5; Bucko Dec. ¶ 4; Ciarelli Dec. ¶ 4; Hanna Dec. ¶¶ 5-6; McEnroe Dec. ¶¶ 4-5). Those PHARMA members which participate in Medicaid and have drug rebate agreements with HHS will be forced to choose between two potentially costly options. If the manufacturers make the rebate payments and the PDP is ultimately invalidated, Vermont's sovereign immunity may prevent the manufacturers from recovering the rebates.[10] *See* Mot. for PI at 25; Declaration of Robert Bucko dated December 13, 2000 ("Bucko Dec.") ¶ 5. If the manufacturers refuse to make the rebate payments and the court later holds the PDP is lawful, HHS could terminate the manufacturers' rebate agreements and their eligibility to participate in all fifty states' Medicaid prescription-drug programs. *See* Mot. for PI at 25-26.

For these reasons, the court holds that PHARMA has standing to raise its non-copayment

---

[10]    The court does not intimate any opinion as to whether Vermont would have sovereign immunity against such claims. PHARMA calls the court's attention to 12 Vt. Stat. Ann. § 5601(a), which waives sovereign immunity for negligent or wrongful acts or omissions by state employees acting within the scope of their employment "in the same manner and to the same extent as a private person would be liable to the claimant." PHARMA also points to Vermont case law interpreting section 5601 so that "[t]he government remains immune . . . for governmental functions for which no private analog exists." *See Noble v. Office of Child Support*, 721 A.2d 121 (Vt. 1998) (citation omitted).

objections to the Vermont PDP on behalf of its affected members.[11]  The court turns to the likely outcome of those challenges on their merits.

> 2.   PHARMA is Unlikely to Succeed on the Merits of its Contention that the PDP Lacks the Requisite "Payment under the State Plan"

> a.   Framing the Issue

By federal statute, manufacturers need pay rebates only on drugs "for which payment was made under the State [Medicaid] plan."  *See* Compl. ¶ 46 (citing SSA § 1927(b)(1)(A), 42 U.S.C. § 1396r-8(b)(1)(A)).  Neither party challenges the validity of this statutory directive or contends that it does not apply here.  Rather, the parties' central disagreement is whether the Vermont PDP violates this directive.

PHARMA emphasizes that because the 17.5 percent discount on drugs dispensed under the PDP is defrayed solely by manufacturer rebates, it cannot be said that those drugs are drugs "for which payment [is] made under the State plan."  *See* Compl. ¶¶ 47-48.  Therefore, PHARMA contends, Vermont cannot require the manufacturers to pay rebates on drugs dispensed under the PDP unless HHS waives section 1396r-8(b)(1)(A)'s requirement of "payment under the state plan."  *See id.* ¶ 49.  PHARMA further contends that HHS never waived that requirement and has no authority to grant such a waiver in any event.  *See id.* ¶¶ 50-52; *see also id.* ¶¶ 53-56 (Medicaid's purpose is to provide "medical assistance," defined by 42

---

[11]   The court notes with approval PHARMA's forceful objection to the notion that it lacks standing to challenge the Vermont PDP: "[U]nder Defendants' remarkable standing theory, no one would have standing to challenge Defendants' . . . actions.  By definition, a 'government program' where the government pays no costs and incurs no detriment, but simply orders private industry to pay, injures only the party ordered to pay.  The beneficiaries of this government-ordered 'program' are unlikely to challenge it.  If the industry members required to pay the costs lack standing to challenge its legality, even though they are the only ones with 'injury in fact' and incentive to pursue the issue, the illegality is irremediable.  That is not the law of standing."  Consolidated Reply Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction and in Opposition to Defendants' Motions to Dismiss ("PHARMA's Reply") at 4.

U.S.C. § 1396d(a) as "payment of part or all of the cost of" medical services, so the PDP does not meet the statutory definition of medical assistance). Consequently, PHARMA reasons, "the Secretary's approval, which requires [manufacturer] rebates to fund the PDP, is invalid because . . . the only 'payment' made by any party, other than the beneficiary, under the PDP benefit is the manufacturer's rebate used to fund the 17.5 percent beneficiary discount." *See* Mot. for PI at 15; PHARMA's Reply at 6 ("There will be no *ultimate* cost whatsoever to either the state or federal governments under this . . . program.") (emphasis added).

PHARMA's submissions sometimes read as if the Secretary had waived the Medicaid statute's requirements of "payment under the State plan." For instance, PHARMA argues

> Waiver of the Section 1901 "medical assistance" requirement is
> not contemplated in the waiver statute. *See* SSA § 1115; 42 U.S.C.
> § 1315 (waiver statute). Neither is waiver of the Section 1905
> "medical assistance" definition. *See id.* Such waivers, moreover,
> would be inconsistent with the very purpose of the statute, under
> which waiver is allowed *only* for demonstration projects which are
> "likely to assist in promoting the objectives of," *inter alia*, the
> Medicaid statute. *Id.* It would be an unlikely interpretation of the
> law indeed to allow the Secretary to waive the "medical assistance"
> requirement (which includes the mandate of state payments in
> Medicaid benefit programs) as somehow "promoting the objectives
> of the Medicaid statute, when that same "medical assistance"
> requirement is described in Section 1901 as an objective of the
> Medicaid statute.

Mot. for PI at 18-19.

But PHARMA goes on to say, "In any event, the Secretary has not purported to waive the medical assistance" requirement or its definition" in the Medicaid statute. *Id.* Helpfully, the defendants agree that the Secretary's approval of the PDP was not based on any waiver of the statutory requirement of "payment under the state plan." Thus, the court construes PHARMA's complaint not as a challenge to any explicit waiver by the Secretary, but as a challenge to the Secretary's approval of a program which they say lacks the requisite payment under the state

17

plan."[12] *See* Mot. for PI at 23 ("The Secretary's approval of the Vermont PDP . . . *amounts to a waiver* of the non-waivable statutory provisions discussed above . . . .").

Under the PDP as approved, a PDP beneficiary pays 82.5 percent of the Medicaid price at the point of purchase, and Vermont pays the pharmacy the remaining 17.5 percent. Both sides agree that the state will recover its entire contribution in the form of manufacturer rebates. However, because manufacturers make rebate payments to the state on a quarterly basis, however, there will be a period during which the state is out of pocket for the 17.5 percent.

Absent guidance from Congress or HHS, it is not obvious whether this payment/reimbursement structure entails "payment under the state plan" as required for the imposition of manufacturer drug rebates. As discussed below, HHS *has* taken action relevant to this issue: the Secretary has directed that Vermont's advances under the PDP be treated as "payments under the state plan." PHARMA, however, contests the applicability of the Secretary's directive. Accordingly, the court first considers whether it is inclined to consider the advances to be payments under the state plan, independent of the Secretary's directive.

On behalf of the defendants, the court notes that Vermont's ultimate reimbursement by the manufacturers may not tell the whole story. Vermont will indeed charge manufacturers rebates that are specifically calculated to approximate the amounts it advances to pharmacists. However, Vermont will not receive these rebates immediately after it advances the 18 percent to pharmacies. For its part, Vermont says it will pay each pharmacy's PDP claims the week after the corresponding purchases.[13] PHARMA does not dispute this claim. After that prompt

---

[12]    Accordingly, the court expresses no opinion on whether the Secretary could waive the requirement of "payment under the State plan" or vary the statutory definition of "medical assistance."

[13]    As Vermont's Department of Social Welfare explained to HCFA, "Payments to pharmacies will be made at the same time as any other payment to pharmacies under the Medicaid program. Claims adjudication of pharmacy claims is nearly 100 percent on-line, and claims are paid weekly. With online adjudication, claims are paid the week following the date of service." Mot. for PI, Ex. C ("Vermont Pharmacy Rebate Program Amendment Request, Questions and Answers," dated September 11, 2000).

payment, Vermont will have to wait for the offsetting manufacturers' rebates, which are paid quarterly. Thus, although it is difficult to quantify the average lag between the state's advance and its reimbursement, it is certain that there will be some delay between the two events. During that period, Vermont will incur the cost of not having the use of the advanced funds. Absent the state's advance of funds to pharmacies, it would be able to make use of the funds in a number of ways, such as leaving the funds with the taxpayers or using the funds to fund other public programs. In addition, the state could have earned interest on the funds if they were collected from taxpayers but not advanced to the pharmacies on behalf of the manufacturers.

> b. If the Court Holds that Vermont's Later-Reimbursed Advances Under the PDP are "Payments Under the State Plan," Could States Abuse the Holding to Inflate their Federal Medicaid Funds?

For its part, PHARMA contends that

> [t]he mere "pass through" of the subsidy [the manufacturer rebate] by the state can not possibly constitute a "payment . . . under the State plan." [citations omitted] Such a reading of the statute would render the world "payment" effectively meaningless. If mere advances were held to constitute "payment" under the Medicaid statute, there would be no limit to the creative abuse that could occur in an effort to increase a state's federal matching funds (which depend on state expenditures for medical assistance, *see* SSA § 1903(a)(1); 42 U.S.C. 1396b(a)(1)).

> For example, states could obtain federal matching funds merely by advancing funds to Medicaid providers and recouping them in simultaneous donations or taxes, a meaningless "paper transaction" that would serve no purpose other than to generate "payments" under the Medicaid statute in order to obtain more federal matching funds.

Mot. for PI at 15 n.4. Viewed in isolation, PHARMA's hypothetical raises the specter of states using pay-and-get-reimbursed schemes to inflate their federal Medicaid funds in a way that looks "dishonest." It may be that some legislators and citizens would not look kindly on such efforts by a state. Indeed, if successful, such efforts would necessarily divert funds that could be spent for other purposes that the people may desire, such as additional funding for Medicaid programs, non-Medicaid programs, tax relief, or debt reduction.

Nonetheless, there are two reasons why such a prospect cannot justify this court's interference with Vermont's PDP. First, even assuming *arguendo* that state payment-and-reimbursement schemes like the one described by PHARMA are unseemly, that is of no avail to PHARMA in this forum. Significantly, PHARMA does not rest its argument on a contention that such a scheme would be unconstitutional or otherwise unlawful, an omission fatal to this portion of PHARMA's argument. This court will not invalidate legislation passed by the people's elected representatives because the legislation contains a loophole that permits conduct that, in a judge's personal opinion, is unethical or contrary to the "spirit" of the legislation. Absent a showing that some constitutional or statutory right is being abridged, it is the province of the legislature to change the law if it perceives that it allows for conduct that is legal but unfair or contrary to the common good.

Secondly, after warning that states could use payment/reimbursement schemes to obtain more federal Medicaid funds, PHARMA states, "Such transactions are specifically excluded from the amount of 'medical assistance' payments a state may claim . . . ." *See* Mot. for PI at 15 n.4 (citing 42 U.S.C. § 1396b(w)(1)). Specifically, in the section of the Medicaid statute that provides for manufacturer rebates to the states, Congress directs:

> Amounts received by a State under this section . . . shall be considered to be a reduction in the amount expended under the State plan in the quarter for medical assistance for purposes of section 1396b(a)(1) of this title.

42 U.S.C. § 1396r-8(b)(1)(B). Thus, according to PHARMA itself, neither Vermont nor any other state could abuse a payment/reimbursement scheme to obtain additional federal Medicaid funds -- at least not without the consent of HHS. For this reason and for the reasons stated above, that possibility provides no basis for enjoining Vermont's PDP.

      c.    The Secretary Has Declared Vermont's Advance of Funds Under the PDP to be "Payment under the State Plan"

In the court's view, the defendants' most persuasive argument is the Secretary's directive that Vermont's expenditures under the PDP "be regarded as expenditures under the state plan."

Apparently, at least one purpose of the Secretary's directive was ensuring that Vermont be eligible to receive federal financial participation (matching funds) for its expenditures under the PDP. The record reflects that those expenditures will consist predominantly of advancing pharmacies 18 percent of the price of covered drugs.

On behalf of PHARMA, the court notes the Secretary did not direct, in so many words, that Vermont's PDP expenditures be considered payments under the state plan *for all purposes*. Consequently, as a matter of construction, it is possible to infer that the Secretary's directive treats PDP expenditures as "payments under the state plan" only for the purpose of the state's eligibility for federal matching funds. On that reading, the defendants could not rely on the Secretary's directive as a basis for treating PDP expenditures as "payments under the state plan" *for the purpose of Medicaid's drug rebate provision*. The court would be left to decide the issue discussed above: whether Vermont's ultimate recoupment of its pharmacy advances should prevent those advances from being considered "payments under the state plan," as required for payment of manufacturer rebates. This interpretation of the Secretary's directive, however, is far from compelling.

To begin with, PHARMA has not argued that the Secretary lacked the legal authority to order that the state's PDP expenditures be treated as "payments under the state plan," and the record offers no basis for such a conclusion. Likewise, PHARMA does not contend the Secretary abused her discretion in ordering that Vermont's PDP expenditures be treated as payments under the state plan. On the contrary, the Medicaid statute expressly provides that "costs" associated with a pilot project may "be regarded as expenditures under the State plan" if the Secretary so directs. *See* 42 U.S.C. § 1315(a)(2)(A). This provision does not limit the purposes for which the Secretary can order pilot-project costs to be treated as payments under a state plan. HHS correctly points out that the Medicaid statute does not define the term "costs" for this purpose. Absent a contrary definition in the governing law, the court is inclined to agree with HHS that "costs" should be accorded its ordinary meaning of "the amount paid or charged for something." *See* HHS's Reply at 5 (quoting Black's Law Dictionary 349 (7th ed. 1999)). When Vermont advances 18 percent of a drug's price to a pharmacy, it certainly incurs a "cost" within the reasonable and customary use of the term. The court sees no basis for redefining the

Medicaid statute's term "cost" to mean something other than what it customarily means, simply because the state will later receive revenue roughly equal to a certain category of costs.

Moreover, if the Secretary was within her rights to treat Vermont's pharmacy-advance costs as payments under the state plan, this court needs specific legal authority to interfere with that discretionary decision.  Significantly, PHARMA points to no case law or other authority which supports such intervention by the court.  Absent such authority, the court is decidedly not inclined to read into the Secretary's directive a qualification which is not in its text.  If the Secretary wished to direct that Vermont's PDP pharmacy advances be considered "payments under the state plan" only for certain purposes, she could have done so.  Specifically, the Secretary might have directed that such expenditures *not* be treated as payments under the state plan for purposes of the manufacturers' rebate agreements.  She did not do so.

The implicit premise that seems to underlie PHARMA's contrary view of state "costs" is that it is *unfair* to let Vermont count PDP pharmacy expenditures as costs when it will get roughly the same amount back from manufacturers later as rebates.  To the extent that such a perception underlies PHARMA's challenge to the PDP, the proper avenue of redress is the HHS or the United States Congress, not this court.

For these reasons, the court is decidedly inclined to hold that (1) Vermont's pharmacy advances under the PDP are "costs," (2) there is no basis for disturbing the Secretary's decision to treat those costs as "payments under the state plan," and (3) thus, under the PDP, Vermont provides "medical assistance"[14] and "payment under the state plan" as required to trigger the manufacturers' obligation to pay rebates for drugs dispensed under the PDP.  Thus, PHARMA is

---

[14]     PHARMA states, "the Medicaid statute explicitly *excludes* manufacturers' rebates from the definition of 'medical assistance' provided under a Medicaid plan."  Mot. for PI at 19 (quoting 42 U.S.C. § 1396r-8(b)(1)(B)).  This is accurate but inapposite.  The defendants do not contend that the manufacturers' rebate payments constitute the necessary "medical assistance" or "payment under the state plan."  Nor does the court's decision today depend on any such notion.  Rather, it is the State of Vermont's payment of 82 percent of PDP drugs' prices to pharmacies which constitutes the necessary "medical assistance" and "payment under the state plan."

unlikely to prevail on the merits of its challenge to the Vermont PDP.

3.    Will PHARMA's Members Suffer Irreparable Harm
In the Absence of a Preliminary Injunction?

As discussed above, the parties agree that tens of thousands of previously ineligible Vermont residents are likely to enroll in the PDP. *See* Mot. for PI at 24; Waiver Request Letter, Mot. for PI, Ex. A at 2-3 (Commissioner of Vermont's Department of Social Welfare states, "Vermont anticipates that 37,550 Medicare covered beneficiaries and an additional 31,350 individuals under 300 percent of the FPL [federal poverty level] will be eligible for this expansion.").

The record tends to support PHARMA's expectation that these new beneficiaries' purchases of prescription drugs under the PDP "will quickly result in claims by Vermont for millions of dollars in rebates under the manufacturers' rebate agreements." *See* Mot. for PI at 24 (citing Bantham Dec. ¶¶ 11 and 14; Alvernini Dec. ¶¶ 4-5; Bucko Dec. ¶ 4; Ciarelli Dec. ¶ 4; Hanna Dec. ¶¶ 5-6; McEnroe Dec. ¶¶ 4-5). Consequently, those PHARMA members that participate in Medicaid and have drug rebate agreements with HHS will be forced to choose between two potentially costly options. If the manufacturers make the rebate payments and the PDP is ultimately held to be unlawful, PHARMA fears Vermont's sovereign immunity may prevent the manufacturers from recovering the rebates.[15] *See* Mot. for PI at 25; Declaration of Robert Bucko dated December 13, 2000 ("Bucko Dec.") ¶ 5. Even if sovereign immunity does not bar manufacturer lawsuits and they are able to recover their rebate payments, they could be

---

[15]    PHARMA does not adequately respond to the case law cited by the defendants which suggests that Vermont's sovereign immunity would not bar its members from suing the state to recover rebates if the PDP is held to be unlawful. Specifically, some state courts have held that state sovereign immunity is waived where financial obligations under Medicaid are in dispute. *See, e.g., Georgia v. Stuckey Health Care, Inc.*, 375 S.E.2d 235 (Ga. App. 1988).

out of pocket for substantial rebates for many months or even years before they prevail in court.[16]

On the other hand, if the manufacturers refuse to make the rebate payments and the court later holds the PDP is lawful, HHS could terminate the manufacturers' rebate agreements and their eligibility to participate in all fifty states' Medicaid prescription-drug programs. *See* Mot. for PI at 25-26. The record does not permit the court to make any reliable estimate of how large the lost Medicaid drug sales would be relative to the manufacturers' non-Medicaid drug sales. Nonetheless, the defendants have not attempted to dispute the likelihood that exclusion from all the states' Medicaid drug programs would substantially damage PHARMA members' revenues and profitability. *Cf.* Mot. for PI at 25-26 ("The economic harm to PHARMA members from . . . termination of the rebate agreement and lost access to all Medicaid-funded prescription drug purchases in all fifty states, would be astronomical.").[17]

---

[16]    The court refuses to credit Vermont's cavalier remark, "PHARMA does not allege that it cannot recover the costs of rebates [through] appropriate price increases. * * * PHARMA members . . . are not restricted by price controls or rate-setting regulations. Thus, pharmaceutical companies may adjust prices to meet revenue and profit goals." Vermont's Opp. to PI at 3. In this respect Vermont cannot have it both ways. On the one hand, Vermont emphasizes that the high price of prescription drugs puts them out of reach for many residents: "Without the assistance of the PDP, these individuals might forego obtaining these medicines, reduce the amount or frequency of their prescriptions for financial reasons, or elect to obtain medicines by sacrificing other necessities." *Id.* at 12 (quoting Dec. of Paul Wallace-Brodeur). Vermont should not then be heard to say that PHARMA's members can "simply raise prices" and get whatever they demand from consumers to make up for the substantial cost of the PDP rebates.

[17]    The court cannot rule out the possibility that such a blow to the profits of PHARMA's members could be large enough to harm their very well-being in the future. Nonetheless, in this Circuit "foreseeable long-term effects do not entitle the [applicant] to preliminary, injunctive relief." *National Treasury Employees Union*, 927 F.2d 1253, 1255 (D.C. Cir. 1991); *see also Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("Injunctive relief will not be granted against something merely feared as liable to occur at some indefinite time . . . .") (citation omitted); *see, e.g.,*

24

While these harms to PHARMA's members are neither unduly speculative nor insubstantial, the defendants have the stronger argument on this issue. First and foremost, it is well established in this Circuit that monetary loss is usually accorded little or no weight in the irreparable-harm analysis. *See Sampson v. Murray*, 415 U.S. 61, 90 (1974) ("[T]he temporary loss of income, ultimately to be recovered, does not usually constitute irreparable injury."); *Davenport v. International Brotherhood of Teamsters*, 166 F.3d 356, 367 (D.C. Cir. 1999) (fact that rule change eliminated flight attendants' *per diem* pay and hotel allowances did not constitute irreparable injury, because change could be remedied with money damages if they prevailed). This court has recently reiterated and followed this principle in denying a health-care provider's motion for preliminary injunction against an HHS directive terminating it from Medicare eligibility. *See Vencor Nursing Centers, L.P. v. Shalala*, __ F. Supp.2d __ (D.D.C. 1999) (Urbina, J.).

Moreover, even if the PDP caused irreparable harm to PHARMA's members, HHS correctly points out that the harm from complying with the PDP cannot fairly be characterized as imminent or "impending" within the context of preliminary injunctive relief. This is because the Medicaid statute gives manufacturers until thirty days after the end of the quarter to submit data on their average prices and their "best" prices, *i.e.*, their discounted prices for preferred customers, for each covered drug in the preceding quarter. *See* 42 U.S.C. § 1396r-8(b)(3)(A). Under the manufacturers' rebate agreements with HHS, the state then has until *sixty* days after the end of the quarter to inform the manufacturers of the number of units of each covered outpatient drug "for which payment was made under the [state Medicaid] plan" for the preceding quarter (referred to as a "drug utilization report"). *See* 42 U.S.C. § 1396r-8(b)(2)(A). Finally, a manufacturer's rebate payments are due thirty days after it receives the state's drug utilization report. *See* 42 U.S.C. § 1396r-8(b)(1)(A). Thus, according to HHS's undisputed calculations, the manufacturers need not pay any rebates under the challenged program until at least April 30,

_____

*Vencor Nursing Centers, L.P. v. Shalala*, __ F. Supp.2d __, __ (D.D.C. 1999) (Urbina, J.) ("Even if there is some risk that" plaintiff's termination from Medicaid would force it to close a nursing-home facility, plaintiff was not entitled to a preliminary injunction).

2001, and possibly as late as June 30, 2001.  PHARMA has not identified anything that would compel its members to run the risks attendant on refusing payment before that time.  The court may well resolve the defendants' motions to dismiss before the end of that period.  If the court grants those motions and rejects PHARMA's challenge to the PDP, its members will have suffered no legally cognizable harm from choosing to participate in a lawful program.  Conversely, if the court denies the defendants' motions, it may invalidate the PDP before PHARMA's members are required to pay any rebates under the program.

On balance, then, the plaintiff's showing on the criterion of imminent, irreparable harm is not a compelling factor in support of preliminary injunctive relief.

### 4. Harm to the Defendants from a Preliminary Injunction

In assessing the harm they would suffer if this court issues a preliminary injunction, the defendants assume they would ultimately prevail on the merits, meaning the PDP would be permitted to resume.  For its part, HHS contends that if this court preliminarily enjoins the PDP, the Secretary would lose crucial data that could help guide her decision whether to approve other prescription-drug programs proposed by other states.  *See* HHS's Opp. to PI at 6.  The court does credit HHS's explanation that "one of the central purposes of the expansion [of Vermont's prescription-drug pilot project] is to provide invaluable information on drug-utilization patterns."  *Id.*  Nonetheless, while the court recognizes the Secretary's legitimate interest in collecting data, HHS seems to exaggerate how much the temporary suspension of one state's Medicaid drug program would impair that interest.  This is particularly so in light of the fact that the Secretary could continue to collect drug-utilization and other data from the Medicaid programs, including pilot projects, of the other 49 states and the District of Columbia.

The likely harm to the defendants, then, does not weigh heavily against preliminary injunctive relief.

### 5. The Public Interest and Harm to Third Parties

In its attempt to show that denial of a preliminary injunction will harm the public interest more than a contrary ruling, PHARMA correctly points out that the public has an "interest in the faithful application of the laws."  *See* Mot. for PI at 29 (citing, *inter alia*, *Nobby Lobby, Inc. v. City of Dallas*, 970 F.2d 82, 93 (5th Cir. 1992) (adopting district court's statement that "the

public interest always is served when public officials act within the bounds of the law"); *see, e.g.,* *O'Donnell Const. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992) (preliminarily enjoining racial set-asides "would serve the public's interest in maintaining a system of laws free of unconstitutional racial classifications," *i.e.*, equal protection). The weight of this interest as a factor favoring injunction, however, depends on whether the action sought to be enjoined actually violates the law. As discussed above, the court is not likely to conclude that Vermont's PDP violates the Medicaid statute. Thus, the public interest in enforcing the law does not add much weight in favor of a preliminary injunction in this case.

PHARMA further contends that if the PDP is not preliminary enjoined, "[a]ny subsequent ruling that the PDP violates the statutory requirements and that manufacturers cannot be compelled to pay the rebates would create chaos in the Vermont program and [cause] irreparable harm to third parties." Mot. for PI at 26. Specifically, PHARMA envisions "chaos" if Vermont is required to refund enrollment fees to PDP beneficiaries, as well as harm to pharmacies which dispensed discounted drugs in reliance on the State's promise to pay the remaining 18 percent of the price. *Id.* at 26-27. The court finds, however, that PHARMA overstates the likely "chaos" and harm that would be occasioned by Vermont having to refund enrollment fees to beneficiaries of an invalidated PDP. As the defendants point out, "Refunding unused portions of enrollment fees would be, at most, a minor administrative inconvenience . . . ." HHS's Opp. to PI at 7 n.2.

PHARMA also points to the possibility that PDP beneficiaries "may resort to legal action to enforce their entitlements under the program." *See* Mot. for PI at 26. This argument adds little to the court's assessment of the harm to non-parties and the public interest in the absence of a preliminary injunction. It is true that PDP beneficiaries might take legal action asserting that the PDP is lawful, but that would cause little more "chaos" or harm than would be occasioned by the defendants' appeal from any ruling by this court that the PDP is unlawful.

Next, PHARMA points to the harm that could befall Medicaid beneficiaries if its members are terminated from Medicaid drug programs for refusing to pay rebates to Vermont under the PDP. Because PHARMA's members include numerous large pharmaceutical companies, their exclusion from Medicaid drug programs would severely curtail the range of drugs available to Medicaid beneficiaries. *See* Mot. for PI at 26. Likewise, because termination

for failure to pay Vermont's PDP rebates would apply to all fifty states' Medicaid programs, the court recognizes that a vast number of people could suffer decreased drug availability if PHARMA's members were excluded from such programs.[18] Nonetheless, PHARMA overstates the weight of this harm in the preliminary-injunction calculus. For one thing, Medicaid beneficiaries would suffer decreased drug availability only from the time PHARMA members were terminated until the time the court held the PDP was unlawful – likely to be a matter of several months, not the much longer period sometimes attendant upon litigation. While that is a meaningful period of time to be deprived of a full range of drugs, that qualification places this potential harm in context. More significantly, the weight of the concern about decreased Medicaid drug availability nationwide turns on the likelihood that PHARMA's members will be terminated from Medicaid drug programs for refusal to pay the Vermont PDP rebates. The court does not find it likely that PHARMA's members will forgo the profits from Medicaid drug sales in the rest of the United States in order to save the cost of paying PDP rebates in Vermont.

Lastly, PHARMA warns that pharmacies will be adversely affected if this court allows the PDP to go forward but later holds it unlawful. *See* Mot. for PI at 26-27. The court does find that the potential harm to pharmacies is more concrete and realistic than most of the other third-party harms identified by PHARMA. After all, to participate in the PDP, pharmacies agree to sell covered drugs at 82 percent of the Medicaid price – which is already lower than the usual retail price -- in reliance on Vermont's promise to pay them the other 18 percent. If the PDP is held to be unlawful, the state may refuse to pay its 18 percent share of the price of drugs dispensed under the program. In addition, the pharmacies will also have forgone the difference between the retail price of the drugs and the Medicaid price. Nonetheless, the weight of the

---

[18] Of course, pharmaceutical companies which are not members of PHARMA and which decide to comply with Vermont's PDP rebates, will not be terminated from Medicaid drug programs. It may be that many Medicaid beneficiaries would be able to purchase equivalent drugs, whether brand-name or generic, from such competing companies. Nonetheless, in fairness to PHARMA, the court assumes *arguendo* that Medicaid beneficiaries would not be able to purchase such equivalent drugs without sales from PHARMA members.

concern about harm to the pharmacies turns on the likelihood that this court will ultimately invalidate the PDP.[19]   Because that is unlikely, the potential harm to pharmacies in the absence of a preliminary injunction adds little to the public-interest and third-party harm analysis.

Balanced against these harms are the harms that third parties and the public interest would likely suffer if the court *did* issue a preliminary injunction.  These harms are substantial. If the court were to enjoin the PDP now, those eligible to enroll would lose the opportunity to purchase covered drugs at the PDP consumer price, which is currently about 18 percent below the already discounted "Medicaid price."  In fairness to PHARMA, the record does not permit the court to make any independent finding as to how many PDP beneficiaries could afford prescriptions if the program were halted.  However, just such a concern may have motivated the Vermont legislature and Governor to enact the PDP.  Absent contrary evidence in the record, this court is reluctant to gainsay a determination by Vermonters' elected representatives that the PDP makes needed prescription drugs more widely available in that state.  Accordingly, the court will not minimize the magnitude of the harm which PDP beneficiaries could suffer if the program were enjoined pending this court's ultimate determination on PHARMA's complaint.

For these reasons, the court concludes that the reasonably foreseeable harm to third parties, and to the public interest, would be greater if the court issued a preliminary injunction than if the court did not.  *Cf. National Ass'n of Farmworkers Orgs. v. Marshall*, 628 F.2d 604, 615 (D.C. Cir. 1980) (court balances interests of parties to assess comparative burdens of the remedy sought).

      6.    <u>Summary</u>

In short, PHARMA is not likely to succeed in its challenge to HHS's approval of Vermont's Pharmacy Discount Program.  Absent a showing of likely success on the merits, "it would take a very strong showing with respect to the other preliminary injunction factors to turn

---

[19]      PHARMA recognizes as much.  *See* Mot. for PI at 27 ("For these reasons, and *given the high probability of success on the merits . . . , PHARMA satisfies the*" factor dealing with harm to third parties in the absence of a preliminary injunction); *id.* at 30 ("Moreover, given the high likelihood of success in this case, granting an injunction is likely to cause the least amount of burden.").

the tide in [PHARMA's] favor." *See Davenport*, 166 F.3d at 367 (citation omitted). PHARMA's showing on these other three factors is not persuasive, let alone compelling enough to compensate for the unlikelihood of success on the merits. Significantly, PHARMA has not shown that the harm its members will suffer is irreparable, nor is the harm so imminent as to justify a preliminary injunction to avert it. Moreover, the parties have not fully joined the issue of Vermont's potential sovereign immunity against manufacturer suits to recover drug rebates. The parties' limited discussion of the subject, and the court's correspondingly limited inquiry, suggests the state may well lack immunity against such lawsuits. For its part, PHARMA has not persuasively shown that its members could not recoup their rebate payments through legal action against Vermont. Thus, this court cannot say that the harm to PHARMA's members absent a preliminary injunction is irreparable.

Lastly, the public interest which PHARMA advances in favor of preliminary injunctive relief is the interest in ensuring that the nation's laws are faithfully followed and executed. This is indeed a valid and strong interest.[20] But its weight in the analysis necessarily depends on the court's assessment of the merits of PHARMA's contention that Vermont's program violates the law. Because it is unlikely PHARMA can show the program violates the law, the public interest

---

[20]     The defendants seem to rely on the putative desirability of taxpayer-funded prescription drugs as a "public interest" factor weighing against preliminary injunctive relief. For instance, HHS and HCFA assert, in conclusory fashion, "The public interest . . . obviously favors allowing Vermont to continue with a project designed to help low- and moderate-income people obtain expensive and potentially life-saving medicines." HHS's Opp. to PI at 8 n.3. The desirability or wisdom of taxpayer-subsidized medicine, however, is a matter of public policy on which this court can take no position. The court agrees with PHARMA that "Defendants' policy arguments should be addressed to the legislature, not the court." PHARMA's Reply at 5; *cf. MOVA Pharmaceutical Corp. v. Shalala*, 140 F.3d 1060, 1066 n.6 (D.C. Cir. 1998) (benefits of speeding public access to new drugs could not outweigh importance of upholding the law, "Our polity would be very different indeed if the courts could decline to enforce clear laws merely because they thought them contrary to the public interest; we decline to embark upon that path.").

in enforcing the law provides little justification for preliminary injunctive relief.

As the Supreme Court has emphasized, "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 525 U.S. 968, 972 (1997). PHARMA has not done so.[21]

## V.   CONCLUSION

For the foregoing reasons, the court holds that the plaintiff is not entitled to a preliminary injunction enjoining the implementation of Vermont's Pharmacy Discount Program or the federal government's approval thereof.[22] An Order consistent with this Memorandum Opinion is

---

[21]   HHS contends that PHARMA's alleged "inexplicable delay" in filing this action "disentitles" it to a preliminary injunction even if such relief would otherwise be warranted. HHS emphasizes that PHARMA knew of HHS's approval of Vermont's PDP on November 3, 2000 but did not file its complaint and motion for preliminary injunction until mid-December 2000. *See* HHS's Opp. to PI at 8-10; HHS's Reply in Support of Mot. to Dis. at 12 n.4. Because the court holds that PHARMA has not satisfied the standard for preliminary injunctive relief, the court declines to address this argument. The court's decision to deny the preliminary injunction does not rest in any part on the defendants' allegations of undue delay.

[22]   PHARMA also requests a preliminary injunction enjoining HHS from approving other states' requests to institute prescription-drug programs that have the features it finds objectionable in the Vermont PDP. *See* Compl. at 27-29. Specifically, PHARMA warns, "If the Secretary's approval is not vacated, and the PDP not enjoined, the Secretary is likely to approve additional state programs violating the Act in the same way as the Vermont PDP. The State of New Hampshire has already submitted a request to the Secretary for a waiver comparable to that granted for the Vermont PDP, and additional states have applied, or intend to apply, to the Secretary for waivers that are substantially similar to, if not identical to, that approved for the Vermont PDP." *See* Mot. for PI at 13 n.2 (citing Bantham Dec. ¶ 17).

separately and contemporaneously executed and issued this 18<u>th</u> day of January 2001.

Ricardo M. Urbina
United States District Judge

_____

Without a concrete controversy before it, however, the court lacks
the constitutional authority to enjoin the approval or
implementation of other states' prescription-drug programs.
Accordingly, the court also denies the plaintiff's request for a
preliminary injunction against other states' actual or contemplated
prescription-drug programs.  The court will also dismiss the
complaint *sua sponte* to the extent that it seeks relief against other
states.  Vermont is the only state that is a party to this action, and
its prescription-drug program is the only program at issue.

*PHARMA v. HHS and State of Vermont*
#2000-cv-2990

## SERVICE LIST

---

**Jeffrey Pariser, Esq.**
Hogan & Hartson, LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1109
*Counsel for the plaintiff, the Pharmaceutical Research and Manufacturers of America*
*("PHARMA")*

---

**Peter Robbins, Esq.**
U.S. Department of Justice
10th & Constitution Ave, N.W.
Room B-327
Washington, D.C.  20530
*Counsel for defendants Secretary of the U.S .Dep't of Health and Human Services and Health*
*Care Financing Administration*

---

**Administrator**, Health Care Financing Admin.
314G Hubert Humphrey Building
200 Independence Avenue, S.W.
Washington, D.C.  20201
*Defendant Health Care Financing Administration*

---

**Susan Harrit, Esq.**
*Counsel for defendant State of Vermont*

---

**The law clerk assigned to assist Judge Urbina with this action is:**

**John M. Brendel, Esq.**
(202) 354-3391, fax -3392
john_brendel@dcd.uscourts.gov